UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CHARLES NEUMAN, pro se,  :
  :
          Plaintiff,  :     **MEMORANDUM**
  :     **AND ORDER**
          -against-  :
  :     04-CV-4590 (DLI)(CLP)
JO ANNE B. BARNHART, Commissioner,  :
Social Security Administration,  :
  :
          Defendant.  :
------------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

      Plaintiff Charles J. Neuman filed an application for disability insurance benefits under the Social Security Act on September 24, 2002. Plaintiff's application was denied initially and on reconsideration. Plaintiff testified at a hearing held before an Administrative Law Judge (ALJ) on April 14, 2004. By decision dated May 14, 2004, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act before his disability insured status expired on September 30, 2002. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on August 20, 2004. Before the court is the Commissioner's motion for a judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), to affirm the ALJ's decision that plaintiff was not entitled to disability insurance benefits. For the reasons stated below, the Commissioner's motion, which is unopposed, is denied and the case is remanded for further evidentiary proceedings.

1

**I.   Facts**

*Plaintiff's Benefits Application and Testimony*

Plaintiff is currently fifty-one years old and was forty-nine at the time of the hearing before the ALJ. He claims February 15, 2002, the date he stopped working because of pain, dizziness, and shortness of breath, as the onset date of his disability. Plaintiff claims that high blood pressure and right knee injury complications limit his ability to work, as he has trouble standing and lifting.

Plaintiff's employment history includes working as a laborer at construction sites from 1987 to February 2002, where he would lift and carry sheet rock, steel beams, and pipes, often weighing twenty-five pounds and sometimes up to one hundred pounds. Plaintiff has also worked as a plumber's helper, a union printer, and part-time cook. Plaintiff is a high school graduate and completed two years of community college.

At the hearing before the ALJ on April 14, 2004, plaintiff testified that his prior jobs have involved working on his feet all day but that, now, he is unable to walk for more than an hour at a time, can sit for only limited periods of time because his leg becomes numb, has to lay down for at least an hour per day, and tends to experience dizziness from high blood pressure. Plaintiff explained that he has "constant pain" in his right knee (Admin. R. at 86), and that he has spoken to doctors about an artificial knee because of a lack of cartilage between the bones. Plaintiff reported experiencing "severe pain" in his right thigh, hip, calf, and knee and that back problems have developed from overcompensating with his left leg. Plaintiff stated that he has osteoarthritis and two forms of joint degenerative disease. Plaintiff was shot in the leg in 1979, and the bullet, which was never removed, entered three inches above the knee.

The ALJ asked plaintiff why he would be unable to work in an office, and plaintiff testified

that, because he takes water pills, he must spend one to two hours in the bathroom per day and cannot sit for more than two hours at a time. Plaintiff testified that he does his own shopping, sometimes takes walks to a park or plays chess, and reads. Plaintiff uses a cane and a knee brace when he is walking.

*Medical Evidence from Before Plaintiff's Disability Onset Date*

Plaintiff sought chiropractic care from Dr. Michael Crohn on March 1, 1995 and indicated on a patient questionnaire that he was suffering from back and hip or leg pain, that these conditions affected his work and family or social life, and that he had previously received chiropractic care. According to Dr. Crohn's records, plaintiff's back pain started when he threw his back out after hitting a pothole while riding a bicycle. Plaintiff saw Dr. Crohn again in August 1995, once in 1997, April 1998, October 2001, and February and September 2003.

On February 21, 2001, plaintiff was referred to the emergency room at Wyckoff Heights Medical Center in Brooklyn because of elevated blood pressure. The Medical Center measured plaintiff's blood pressure as 220/136 and his EKG was abnormal. Plaintiff left the emergency room against medical advice.

*Medical Evidence from the Relevant Period (February 15 to September 30, 2002)*

Plaintiff's treating physician, Dr. Himanshu Patel, began seeing plaintiff on a monthly basis around April 12, 2002. On or about this date, Dr. Patel measured plaintiff's blood pressure as 210/140 and his weight as 320 pounds and ordered blood tests. Plaintiff returned in one week to see Dr. Patel on April 24, 2002, and his blood pressure was recorded as 140/88 to 150/90. On June 29, 2002, plaintiff saw Dr. Patel for a rash on both of his legs, and his blood pressure was 140/84. On September 26, 2002, plaintiff complained to Dr. Patel that he had been experiencing pain in his right

3

knee for one week or more and reported the history of the gunshot wound he received in 1979. Dr. Patel diagnosed plaintiff with right knee osteoarthritis and obesity. Plaintiff's blood pressure was 165/90.

On a report filled out on March 29, 2004, in support of plaintiff's application for disability insurance benefits, Dr. Patel diagnosed plaintiff with right knee osteoarthritis and cartilage damage, high blood pressure, and obesity. Dr. Patel noted that plaintiff must lie down two to three hours per day. Dr. Patel opined that, during an eight-hour workday, plaintiff could sit two to three hours per day, stand one hour per day, "occasionally"[1] lift or carry up to five pounds, and "occasionally" bend. (Admin. R. at 76.) Dr. Patel described plaintiff as capable of using his hands for repetitive actions such as grasping, pushing, and fine manipulations but incapable of repetitive leg movements such as pushing and pulling. Dr. Patel noted that plaintiff has no restrictions in driving a motor vehicle and that he is capable of traveling alone by bus or subway on a daily basis.

On a Social Security Administration Field Office Disability Report, dated September 24, 2002—based on a face-to-face interview—the only limitation noted was that plaintiff had difficulty walking and that he walked with a cane.

*Medical Evidence from After the Relevant Period*

Plaintiff submitted records of x-rays taken after the September 30, 2002 expiration of his insured status. An x-ray taken October 2, 2002 revealed "a radiopaque foreign body visualized within the metaphysis of the distal femur, believed to represent a bullet. . . . [,] evidence of radiopaque densities, believed also to represent schrapnel. . . . [, and] a small area of osteoarthritic

---

[1] "Occasionally" was defined on the assessment form Dr. Patel filled out as 1–33% of a workday.

4

changes at the lateral aspect of the proximal tibia. Negative for fracture or dislocation." (Admin. R. at 61.) Dr. Patel examined plaintiff on October 4, 2002 and noted that plaintiff was experiencing swelling but was not in pain. Plaintiff's right knee was x-rayed again on August 26, 2003. While the x-ray revealed bullet fragments, the alignment of plaintiff's knee joint was normal.

## II. Applicable Law

### A. *Standard of Review*

The district court reviews the Commissioner's decision to determine whether it is supported by substantial evidence and based on correct legal standards. *Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). In the court's review of the record, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the application and regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases).

"Where there are gaps in the administrative record, remand to the Commissioner for further

development of the evidence is in order." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). In contrast, remand to further develop the record is unnecessary if the court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision" and it is clear that the plaintiff is entitled to benefits. *See Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). In such case, the court may remand solely for the calculation of benefits. *Id*. The court may also "at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

"Because the determination of eligibility for disability benefits is a nonadversarial proceeding, the Commissioner generally has an affirmative obligation to develop the administrative record." *Sharbaugh v. Apfel*, No. 99-CV-277, 2000 WL 575632, at *3 (W.D.N.Y. Mar. 20, 2000) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)). Where the record is incomplete or ambiguous, it is the Commissioner's duty to obtain additional evidence or clarification from medical sources or remand the case for the ALJ to do the same. *See, e.g.*, *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004); *Sharbaugh*, 2000 WL 575632, at *3. The duty to develop the record extends to both the ALJ and the Appeals Council. *See, e.g.*, *Dimitriadis v. Barnhart*, No. 02 Civ. 9203, 2004 WL 540493, at *9 (S.D.N.Y. Mar. 17, 2004); *Sharbaugh*, 2000 WL 575632, at *3.

B. *Determination of Disability*

To qualify for disability insurance benefits, an individual must be "insured" for the benefits. 42 U.S.C. § 423(a). "Insured status" is calculated based on factors such as the individual's age and "quarters of coverage" accumulated from earned wages and self-employment income. 42 U.S.C.

§ 423(c); 20 C.F.R. § 404.101(b). Plaintiff must establish that he was "disabled" within the meaning of the Social Security Act before the expiration of his insured status. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999). Evidence of a pre-existing impairment that reached disabling severity only after the expiration of a plaintiff's insured status is insufficient. *See id.* (citing *Arnone v. Bowen*, 882 F.2d 34, 41 (2d Cir. 1989)).

An individual is "disabled" under the Social Security Act where there is "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5); *see also Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 404.1520, there is a five-step process whereby the ALJ determines disability under the Social Security Act. If at any step, the ALJ makes a finding that the claimant is either disabled or not disabled, the inquiry ends there. At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers the medical severity of the claimant's impairment(s), without reference to age, education, or work experience. To be considered disabled, the claimant must have a physical impairment that, either individually or in conjunction with other such impairments, satisfies the duration requirement in § 404.1509. 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed

in Appendix 1.[2]  20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. § 404.1520(e). The "residual functional capacity" is "the most [the claimant] can still do despite . . . limitations." 20 C.F.R. § 404.1545(a). The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations. *Id*. In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to show that the claimant could perform the other work. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

### C. *Consideration of Treating Physician Opinions*

Pursuant to 20 C.F.R. § 404.1527(d)(2), the ALJ must evaluate treating sources as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

If the ALJ does not give controlling weight to a treating source, the ALJ then applies several factors in determining what weight to give the opinion, including the length, nature, and extent of the treatment relationship, the frequency of contact with the treating source, whether evidence such as laboratory findings supports the source's opinion, the consistency of the opinion with the rest of the

---

[2] 20 C.F.R. pt. 404, subpt. P, app. 1.

8

record, and whether the treating source is a specialist. 20 C.F.R. § 404.1527(d). These factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts. 20 C.F.R. § 404.1527(f).

This non-absolute standard of deference to treating sources superceded the "treating physician rule," which existed prior to 1991, whereby a treating physician's opinion was binding absent any contradicting evidence and given extra weight even if contradicted. *Schaal*, 134 F.3d at 504. Regardless of how the ALJ weighs the different opinions in the record, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Rosa*, 168 F.3d at 79 (quoting *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)).

## III.   Analysis of the ALJ's Decision

The ALJ found that plaintiff's impairments—including a right knee condition, high blood pressure, and obesity—were "severe" as defined by the Social Security Act but that, under step three of the analysis, they were not sufficiently "severe" to meet or equal an impairment listed in Appendix 1. The ALJ identified two relevant listings, 1.02 and 1.03:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;[3]

---

[3] b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk;

9

or

> B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.
>
> 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. pt. 404, subpt. P, app. 1. Though the ALJ did not specifically explain why he concluded that plaintiff's impairments did not fall under listings 1.02 or 1.03, the medical evidence in the record indicates that the ALJ's analysis was based on substantial evidence. X-rays from October 2002 and August 2003 showed that there was no fracture or dislocation and that plaintiff's knee alignment was normal. However, even if plaintiff's cartilage damage could be considered a "gross anatomical deformity," as described in the 1.02 impairment listing, the evidence does not indicate that plaintiff could not ambulate effectively. Although plaintiff walks with one cane, the definition

---

i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

of inability to ambulate in 1.00B2b of Appendix 1 specifies using two canes or crutches or a walker and not being able to use public transportation. Plaintiff testified that he is able to walk to the park, and Dr. Patel opined that, even in 2004, when plaintiff's limitations had worsened, he could use public transportation.

The ALJ next analyzed plaintiff's "residual functional capacity." Under step four, the ALJ concluded that plaintiff was unable to perform past relevant work. The ALJ noted that the burden thus shifted to the Social Security Administration to show that the plaintiff could perform other work consistent with his age, education, and work experience.

In step five, the ALJ found plaintiff capable of "perform[ing] a full range of sedentary work." (Admin. R. at 12.) In doing so, the ALJ considered Dr. Patel's assessment of plaintiff's condition but decided that Dr. Patel's conclusions did not reliably indicate whether plaintiff became disabled prior to the expiration of his insured status on September 30, 2002. The ALJ found:

> Given that this report was completed in March of 2004 and given that the claimant's first treatment with this physician was only five months prior to the claimant's last insured date, the level of disability reported, does not appear to be valid for the period of disability claimed prior to October 2002, particularly since there is no persuasive supporting medical evidence from that period.
>
> There is evidence that the claimant developed further non-exertional limitations subsequent to his last insured date in September 2002. A July 2003 MRI revealed marked degenerative disease and meniscal tear of the knee. In contrast, there is no persuasive objective medical or diagnostic evidence that the claimant's knee impairment resulted in marked limitations prior to October of 2002. In fact, October 2002 x-rays of the right knee revealed a bullet fragment within the kneecap but further noted only a small area of osteoarthritic changes that was negative for fracture or dislocation.

(*Id*. at 12 (internal citations omitted).) While the ALJ correctly noted that the bulk of Dr. Patel's treatment of plaintiff occurred outside of the relevant period, he did not attempt to ascertain Dr. Patel's opinions as to plaintiff's condition between April and September 2002. The ALJ's decision

to not give Dr. Patel's assessment controlling weight may have been proper. However, in light of the absence of other medical evidence in the record, the court is not fully satisfied that the ALJ fulfilled his duty to develop the administrative record. For example, after noting the gap between Dr. Patel's assessment and the expiration of plaintiff's insured status, the ALJ did not "request additional existing records, recontact [plaintiff's] treating sources or any other examining sources, ask [plaintiff] to undergo a consultative examination at [the Commissioner's] expense, or ask [plaintiff] or others for more information." 20 C.F.R. § 404.1527(c)(3). Instead, the ALJ seemed to rely heavily on plaintiff's own testimony about his limitations, noting that plaintiff "testified that he does his own shopping, that he goes to the park to play chess, and that he reads history and fiction." (Admin. R. at 12.)

The ALJ analyzed plaintiff's capacity for work under the Medical-Vocational Guidelines. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 ("Appendix 2"). Using a grid for claimants whose residual functional capacity is limited to sedentary work, the ALJ classified plaintiff under Rule 201.21 in Table No. 1, noting that because plaintiff was a "younger individual age 45-49" with a high school degree but no transferable skills or semi-skilled-skills, these factors directed a conclusion of "not disabled." *See id*.

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567. "Sedentary work" is defined in Social Security regulations as sitting for six hours during an eight-hour workday. *E.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (citing Determining Capability To Do Other Work—Implications of a Residual Functional Capacity

for Less Than a Full Range of Sedentary Work, 61 Fed. Reg. 34478, 34480 (Social Security Admin. July 2, 1996)).

While "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight," *Halloran*, 362 F.3d at 33, in the present case, the ALJ did not fully investigate plaintiff's limitations. The ALJ failed to question plaintiff thoroughly about how long plaintiff usually walks or reads and assumed that, simply because plaintiff engages in these activities, plaintiff is capable of a full range of sedentary work. Even if the ALJ was doubtful that any limitations plaintiff had at the time of the hearing were not sufficiently severe before plaintiff's insured status expired, it was the ALJ's duty to develop the administrative record and delineate the time frame and extent of plaintiff's limitations. It is the ALJ's burden to demonstrate at step five that plaintiff was not disabled, and the ALJ failed to affirmatively meet this burden by not exploring the nature of plaintiff's capacity for sedentary work. Because the ALJ did not fully investigate in step five, this case is remanded to the Commissioner for further evidentiary proceedings.

**IV.    Conclusion**

This case is remanded to the Commissioner for further evidentiary proceedings. To prevent delay in the processing of plaintiff's case, further proceedings before the ALJ must be completed within sixty days of the issuance of this order, i.e. by September 20, 2006; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts*, 388 F.3d at 388 (suggesting procedure and time limits to ensure speedy disposition of Social Security cases following remand by a district court). "[I]f these deadlines are

not observed, a calculation of benefits owed [to plaintiff, Charles Neuman] must be made immediately." *Id.* Upon remand, the Commissioner should explore with more precision plaintiff's limitations during the relevant period and capacity for sedentary work. The Commissioner should obtain further information from Dr. Patel or from a vocational expert, as necessary.

SO ORDERED.

DATED: Brooklyn, New York
July 21, 2006

_____/s/_____
DORA L. IRIZARRY
United States District Judge